**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STACY WILLIAMS,** | § | |
| **o/b/o her minor grandson, J.J.,** | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:23-cv-289** |
| | § | |
| **ANDREW WILLIAMS, and** | § | |
| **JOE SPRADLIN,** | § | |
| ***Defendants.*** | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, STACY WILLIAMS on behalf her minor grandson J.J., complaining of Andrew Williams and Joe Spradlin, and for cause of action will respectfully show unto the Court as follows:

> The Due Process Clause of the Fourteenth Amendment "forbids the state itself to deprive individuals of life, liberty, or property without 'due process of law' ...."

*DeShaney v. Winnebago County Dep't of Social Servs*., 489 U.S. 189, 195 (1989).

> Houston Fire Department EMS professionals, under authority of their state licensure, the endorsement of the department, and credentialing by the Medical Director, have unsupervised, intimate physical, and emotional contact with patients at a time of maximum physical and emotional vulnerability...EMS professionals, therefore are placed in a position of the highest public trust.

The Rule of Public Trust: Houston Fire Department Patient Care Guideline 6.01(B).

**SUMMARY**

On January 26, 2021, Stacy Williams frantically dialed 911 seeking medical attention for her grandson J.J. Ms. Williams was concerned because J.J, a survivor of shaken baby syndrome and who had a history of cerebral palsy, had not urinated all day and had discolored lips and fingertips. Certified Houston Fire Department Paramedics Defendant Andrew Williams and Defendant Joe Spradlin responded to the 911 call and claimed J.J had no pulse. Defendant Williams and Defendant Spradlin refused to administer crucial life saving measures such as cardiopulmonary resuscitation (CPR) and chest compressions, and instead informed Ms. Williams that J.J. was "gone." Shockingly, Defendant Spradlin told Ms. Willims that "it will take an act of God" to revive J.J. in response to Ms. Williams continuing to beg for her grandson to receive medical attention, and even when J.J showed signs of life after vomiting. Only when Ms. Williams attempted to rescue J.J. herself by picking him up in an attempt to take him to the hospital did Defendant Williams ask Ms. Williams if she wanted them to attempt CPR.

CPR was only administered nine minutes after the Defendants initial arrival at the scene when a second EMS unit came to the scene. Defendant Williams and Defendant Spradlin continued to refuse to provide crucial medical care to J.J. by delaying his transport to the nearest hospital by approximately twenty-four minutes. Thankfully, hospital staff at Memorial Hermman Hospital successfully resuscitated J.J. after immediately initiating CPR. Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the incident that forms the basis of this lawsuit. Ms. Williams on behalf of her grandson J.J now files suit under the Fourteenth Amendment to the United States Constitution against Defendant Williams and Defendant Spradlin.

## I.
## PARTIES

1.     Plaintiff is a resident of Harris County, Texas.

2.     Defendant Andrew Williams is an individual residing in Harris County, Texas and may be served at his place of employment at the Houston Fire Department located at 500 Jefferson, Suite 1700, Houston, Texas, 77002, or wherever he may be found. He is being sued in his individual capacity.

3.     Defendant Joe Spradlin is an individual residing in Harris County, Texas and may be served at his place of employment St. Joseph Medical Center located at 1401 St. Joseph Parkway, Houston, Texas, 77002, or wherever he may be found. He is being sued in his individual capacity.

## II.
## JURISDICTION AND VENUE

4.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §1391 because the Defendants are domiciled and/or reside in the Southern District of Texas, and all or a substantial part of the causes of action accrued in the Southern District.

## III.
## FACTS AND ALLEGATIONS

### Refusal to Render Life-Saving Aid by Houston Fire Department EMT Andrew Williams and EMT Joe Spradlin.

6. On January 26, 2021, at 12:54 a.m. Plaintiff Stacy Williams called 9-1-1 requesting assistance at the Staybridge Hotel and Suites in Humble, Texas.

7. Ms. Williams frantically told the 9-1-1 operator that her grandson J.J. had not urinated all day and had discolored lips and fingertips.

8. Defendant Andrew Williams and Defendant Joe Spradlin, certified paramedics with the City of Houston Fire and Rescue Department ("HFD") with EMS Unit M063, responded to the 9-1-1 call.

9. Defendant Williams and Defendant Spradlin arrived at the scene at approximately 1:06 a.m.

10. When Defendant Williams and Defendant Spradlin arrived first at the scene Defendant Spradlin disregarded additional EMS Units, specifically Unit E063 and Supervisor 30.

11. Ms. Williams explained to Defendant Williams and Defendant Spradlin that J.J. had a history of cerebral palsy and shaken baby syndrome as well as a history of a low heart rate and low body temperature. Below is a screen capture of the incident report narrative which details the information Ms. Williams communicated to the Defendants.

**Clinical Info / Narrative**

| Complaint Type | Complaint |
| --- | --- |
| Chief (Primary) | CARDIAC ARREST |

**ETOH/Drug Indicators:** None of the Above Reported

**Primary Symptom:** Cardiac arrest **Began:** 01/26/2021 00:33:54

**Activity:** Laying down (supine/prone/lateral recumbent)

**Possible Injury:** No **Cardiac Arrest:** Yes, PRIOR to HFD Arrival

**Narrative:** M-63 AOSTF A 14 Y/O B/M LYING SUPINE IN BED IN CARE OF HIS MOTHER. PT HAS A HX OF SHAKEN BABY SYNDROME, SEIZURES, CEREBRAL PALSY. PT MOTHER STATES THAT SHE CALLED BECAUSE HER SON HAS BEEN SLEEPING ALL DAY AND IS NOT ALERT RIGHT NOW. MOTHER STATES THAT SHE MOVED HIM TO THE BEDROOM AND THAN SUCTIONED HIM APPROXIMATEY 30 MINUTES PRIOR TO EMS ARRIVAL. UPON M-63 ARRIVAL THE PT MOTHER STATED THAT HIS HEART RATE IS NORMALLY LOW IN THE 30'S-40'S. PT IS COLD TO THE TOUCH AND DOES NOT APPEAR TO BE BREATHING. UNABLE TO PALPATE A PULSE, HEAR LUNG SOUNDS, OR HEART TONES. PADS PLACED ON THE PT WITH AN INITIAL RHYTHM OF ASYSTOLE. MOTHER STATES THAT HE IS STILL BREATHING AND THAT HIS HEART IS BEATING. M-63 INFORMED THE PT MOTHER THAT THE PT HAS NO ELECTRICAL ACTIVITY FROM HIS HEART AND HAS NO PULSE. PT MOVED TO THE FLOOR AND CPR INITIATED. IO ACCESS ESTABLISHED AT THE LEFT HUMERAL HEAD. NUMBER 3 IGEL PLACED, SECURED WITH FILTER ATTACHED, AND BVM

12. Defendant Williams and Defendant Spradlin found J. J. lying on the hotel bed unresponsive.

13. At the time Defendant Williams and Defendant Spradlin found J.J. unresponsive, J.J did not have an Out-of-Hospital Do-Not-Resuscitate (DNR) order nor did they confirm if one was in place.

14. At the time Defendant Williams and Defendant Spradlin found J.J. unresponsive he had no obvious mortal wounds, no decomposition, and was not in rigor mortis.

15. At the time Defendant Williams and Defendant Spradlin found J.J. unresponsive he did not have absence of any signs of life on EMS arrival associated with a penetrating head injury or penetrating extremity injury with obvious exsanguination.

16. At the time Defendant Williams and Defendant Spradlin found J.J. unresponsive he did not have absence of any signs of life on EMS arrival associated with blunt trauma.

17. Despite having found J.J. unresponsive, Defendant Williams and Defendant Spradlin did not immediately initiate crucial life-saving measures such as CPR or chest compressions.

18. After checking J.J.'s pulse, Defendant Spradlin and Defendant Williams told Ms. Williams "Oh yeah ma'am he's gone. Yeah ma'am. He has no pulse, he's gone.

19. Ms. Williams urged Defendant Williams and Spradlin to give J.J medical attention as J.J.'s history of a low heart rate and low body temperature—which she had communicated to the Defendants—explained why there might be difficulty finding a pulse.

20. However, Defendants Williams and Spradlin again refused to administer crucial life-saving measures such as CPR or chest compressions and Defendant Spradlin declared to Ms. Williams that "he's gone."

21. Communicating to Ms. Williams that J.J. was "gone" and did not have a pulse demonstrates that Defendant Williams and Defendant Spradlin were aware of J.J.'s medical needs, specifically that he needed critical life-saving measures such as CPR and chest compressions.

22. However, despite being aware of J.J.'s serious medical needs Defendant Williams and Defendant Spradlin did not render critical life-saving measures such as CPR and chest compressions.

23. Defendants Williams retrieved an ECG machine in an attempt to locate a cardiac rhythm.

24. The ECG machine was powered on at 1:08 a.m.

25. The ECG recorded that J.J was in asystole at 1:18 a.m.[1]

26. According to Defendant Spradlin's disciplinary report: "Spradlin reported that FFF Williams told him the patient did not appear to be breathing, was cold to the touch and that he was unable to locate a pulse. EO Spadlin then attempted to locate a femoral pulse on the patient, while FF Williams placed the cardiac monitor on the patient. EO Spradlin reported the patient was placed on the monitor at 0108 and the initial rhythm showed asystole."

---

[1] Asystole, colloquially referred to as flatline, represents the cessation of electrical and mechanical activity of the heart.

27.    Defendant Spradlin told Ms. Williams there was no heartbeat, stating again that "he's gone" and did not begin resuscitation efforts such as chest compressions or CPR.

28.    Ms. Williams begged Defendant Spradlin and Defendant Williams to do something and explained that approximately thirty minutes prior to EMS arrival J.J. was responsive as she had just given him medication by mouth and suctioned him to clear his airway.

29.    According to his disciplinary report: Spradlin stated "at this point, I looked at the mother and told her that her son was not breathing, had no heartbeat, there was no electrical activity from his heart on the monitor, was very cold to the touch, and that he had unfortunately passed away. The mother became very upset and began urging M063 to do something. Spradlin reported the mother reached over and shook her son, shouting, "Wake up!" EO Spradlin stated," I again reported to her our exam findings and that he had passed away."

30.    Despite this information, Defendants Williams and Spradlin continued to deliberately refuse administration of life-saving measures such as CPR and chest compressions and Defendant Spradlin kept repeating to Ms. Williams that "he's gone."

31.    Shockingly, Defendant Spradlin declared it would take "an act of God" to revive J.J.

32.     Ms. Williams, panic-stricken, scooped J.J. from the hotel bed and told Defendant Williams and Defendant Spradlin that she would take J.J. to the hospital herself in an attempt to save him.

33.    Only then did Defendant Williams ask if Ms. Williams wanted them to do CPR.

34.    Defendant Williams moved J.J. from the bed to the floor in preparation for CPR.

35.    According to Defendant Spradlin's disciplinary report: "EO Spradlin reported the mother went over to her son and attempted to pick him up, stating "well, then I'll just take him

myself." "EO Spradlin stated, "I then told Andy [Defendant Williams] that we were going to have to work him."

36. Moving J.J. from the bed to the floor in preparation for CPR demonstrates that Defendant Williams and Defendant Spradlin were aware of J.J.'s medical needs, specifically that he needed critical life-saving measures such as CPR and chest compressions.

37. However, Defendants Williams and Spradlin did not administer CPR nor provide any medical attention at all to J.J. after moving him from the bed to the floor.

38. Vomit began to come out of J.J.'s nose and mouth.

39. Ms. Williams pleaded with Defendants Williams and Spradlin to utilize a suction machine for the vomit.

40. Despite obvious indication that there were signs of life and J.J. was not deceased as he had begun to vomit Defendants Williams and Spradlin deliberately ignored obvious signs of a medical crisis and did not suction vomit that had been aspirated and began draining out of J.J.'s nose as well as continued to refuse to administer life saving measures such as CPR or chest compressions.

41. J.J. finally received CPR when a second EMS Unit E063 arrived on scene at approximately 1:08 a.m.[2]

42. Unit E063 consisted of certified EMTs Benjamin Abott, Thuyet Vo, Jeffrey Bock, and Robert Goerner. Below is the clinical info/narrative detailing the unit's arrival and administration of CPR.

[2] Unit E063 is the unit that Defendant Spradlin disregarded initially when he and Defendant Williams arrived at the scene.

**Clinical Info / Narrative**

**ETOH/Drug Indicators:** None of the Above Reported

**Cardiac Arrest:** Yes, AFTER HFD Arrival

**Narrative:** E63 was dispatched to. assist M63 on location with CPR upon arrival crew from E63 assisted with CPR pt was a 14 yo b m pt was moved to Medic unit and 1 ff from E63 assisted in the rear and 1 ff drove M63 to er for pt info see M63 report

**Crew Completing this Report:** ABBOTT, BENJAMIN - 119857

43. Hospital records later indicated that CPR was initiated at 1:15 a.m. which is after E063 arrived.

**Triage**

*Chief Complaint :* pt mom found pt unresponsive; EMS arrived, pt was apneic and pulsless - CPR started by EMS at 0115, 4 epi given en route, I-gel in place; CPR continued on arrival to ED; hx of cerebral palsy and shaken baby sydrome

*FCT RFV :* Yes

44. This means that J.J. went without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 initially responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

45. Interestingly, according to Defendant Spradlin's disciplinary file: "Spradlin reported that they moved the patient and equipment to the living room. Spradlin stated, "I was on the floor performing CPR on the patient when I used my handheld radio to call for a 7-10 page requesting E063 return to the scene. Once on the floor I immediately began performing CPR while Andy [Defendant Willaims] inserted a #3 iGel and got the BVM to begin ventilating the patient. Spradlin reported he believed from the time M063 entered the room until CPR was being performed was less than 2 minutes. "

46. However, according to Defendant Spradlin and Defendant Willaims' disciplinary file "the download from the LifePak 15 assigned to M063 during this incident showed the monitor was turned on at 1:08:52, was connected to a patient at 1:10:18 and that CPR began at 1:15:00. Assistant Medical Director Chris Souders reported although the LifePak clock is not synced directly with the CAD clock, clear evidence exists that the monitor was placed on the patient in asystole and CPR was not initiated for 5 minutes. Furthermore, the PCR narrative did not indicate

the paramedics initially considered the patient DOA nor record any reason for the delay in initiating CPR."

47. Therefore, upon information and belief Defendants fabricated what time CPR was performed on J.J in order to cover up their unjustifiable conduct as despite claiming CPR was performed within less then two minutes upon Defendants' arrival the true facts are that J.J. went without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

48. Defendants Williams and Spradlin placed J.J. in the back of an ambulance after he received CPR.

49. After being placed into an ambulance, J.J. was not immediately transported to the nearest emergency facility at Memorial Hermman Hospital which was 1.5 miles away from the scene.

50. Instead, Defendant Spradlin informed Ms. Williams that he had to contact their supervisor for approval first before transporting J.J. to the nearest hospital.

51. Records indicate that EMS Unit A064 arrived and assisted the Defendants (Unit M063) on scene and during transport to the hospital.

**Possible Injury:** No **ETOH/Drug Indicators:** None of the Above Reported **Cardiac Arrest:** Yes, PRIOR to HFD Arrival

**Narrative:** A064 assisted M063 on scene and during transport to hospital with 14 y/o b/m in cardiac arrest. See M063 record for further detail. A064 returned to service.
**Crew Completing this Report:** BENODIN, LESLY - 161450

52. EMS Unit A064 listed on scene treatment >20 minutes.

53. EMS Unit A064 arrived at the scene at 1:23 a.m., left the scene at 1:47 a.m. and did not arrive to the hospital until 1:52 a.m.

54. EMS Unit M063 indicated that "PT (patient) placed on the backboard to move to stretcher and loaded into M-63 for transport. AS-30 arrived on scene just when PT (patient) was loaded into the Medic."

55. AS-30 marked their arrival time as 1:23 a.m.

Inc # / Disp.: 2101260033 / Unconscious Person
EMS Unit: AS030 Initial Disp. Code: FEUCD1
EMS Shift: C
Street: WILL CLAYTON IBOB @ 18298 EASTEX FWY IB
City: HOUSTON, TX 77338 (Key 375B)
Disposition: Disregarded On Scene

@ PSAP: 01/26/2021 00:55:36
@ Dispatch: 01/26/2021 00:58:40
Unit Notified: 01/26/2021 00:58:56
En Route: 01/26/2021 01:06:53
@ Scene: 01/26/2021 01:23:00
Left Scene: 01/26/2021 01:30:00
@ Hospital:
Cancelled: 01/26/2021 01:24:00
In Service: 01/26/2021 01:51:28
Care Transfer:

56. However, Defendants indicated that they left the scene at 1:52 a.m. and arrived at the hospital at 1:52 a.m.

57. Upon information and belief Defendants fabricated what time they left the scene and arrived at the hospital in order to conceal the fact that they delayed transporting J.J to hospital as they loaded up J.J in the back of their vehicle when AS-30 arrived on scene at 1:23 and did not leave for the hospital until 1:47 a.m. when A064 arrived to assist with transport to the hospital.

58. This harmfully delayed J.J.'s transport to an ER for approximately twenty-four minutes.

59. The ambulance did not arrive at Memorial Hermann Northeast Hospital until 1:52 a.m. despite being less than two miles away from the hospital.

60. Hospital staff at Memorial Hermman Hospital immediately initiated CPR and successfully resuscitated J.J. at 2:04 a.m.

61. Due to the failure of Defendant Williams and Defendant Spradlin to administer life saving measures such as chest compressions and CPR, J.J. did not receive proper, timely or effective emergency medical care.

62. As a result of Defendant Williams and Defendant Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions J.J experienced an unnecessary and prolonged period without oxygen.

63. J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

64. As a result of Defendants Williams and Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions J.J. suffered brain damage due to the extended period of lack of oxygen.

65. Prior to the incident that forms the basis of this lawsuit J.J ate and took medicine through his mouth and had a tube only for liquids.

66. J.J. can no longer eats regularly and needs to be fed through a tube.

67. J.J. is also not as responsive when individuals are communicating with him and merely rocks back and forth.

68. J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

69. These injuries were not caused by any other means.

**<u>Sustained Complaints Against Defendants Williams and Spradlin</u>**

70. On February 8, 2021, Ms. Williams submitted a Complaint to the City of Houston Fire Department ("HFD") Professional Standards Office concerning the allegations described above.

71. Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the incident that forms the basis of this lawsuit.

72. Below is a screen capture of the conclusions reached by the HFD Professional Standards Office. HPD completed an investigation of Defendant Spradlin and Defendant Williams on May 26, 2021. Notably, the Professional Standards Office sustained policy violations including: 1) *Section 5.13 Performance of Duty*; 2) *Section 6.06 Documentation*; 3) *Section 6.21 Riding in Charge;* 4) *Section 7.01 Patient Assessment*; and 5) *Section 8.2 Cardiac Arrest Emergencies.*

**Date:** July 14, 2021

**Subject:** Notice of Completed Investigation Results for Complaint Case: 2021-033

The following complaint has been investigated; this is your notice of investigation results. This case is officially closed.

**Complainant:** Citizen Stacy Williams

**Respondents:** Joe Spradlin / Engineer Operator / EMT / D064 / C Shift
Andrew Williams / Firefighter / EMT / D064 / C Shift

**Conclusion Date:** May 26, 2021

**Conclusion Results:**
**Violation of HFD Rules and Regulations – Sustained.**
§ 5.13 Performance of Duty
**Violation of HFD Patient Care Guidelines – Sustained.**
§ 6.06 Documentation
§ 6.21 Riding in Charge
§ 7.01 Patient Assessment and
§ 8.02 Cardiac Arrest Emergencies

Questions may be directed to Senior Investigator Michael Hull at (832) 394-6707.

Thank you,

Senior Captain Elridge Dupont
Houston Fire Department
Professional Standards Office
500 Jefferson Street, Suite 1902
T: 832-394-6930 F: 832-394-6784

By his misconduct hereinafter detailed, EO Spradlin has also violated certain provisions of the rules and regulations of HFD and made applicable herein under Rule 13, Section 6, set forth above, of the Firemen's and Policemen's Civil Service Commission rules governing the Fire Department. EO Spradlin had access to a copy of the COH Civil Service Commission Rules Governing Members of the Fire and Police Departments as well as HFD rules and regulations and was required to have read and conducted himself by, and in accordance with, said rules and regulations.

The specific provisions of the Houston Fire Department (HFD) Rules and Regulations in which EO Spradlin has violated include, but are not limited to:

**HOUSTON FIRE DEPARTMENT GUIDELINES - RULES AND REGULATIONS: Volume 1, Reference 1-01:**

**Section 5.13 – <u>Performance of Duty</u>:** Members shall be prepared and able to perform all lawful duties as defined by their position. Members shall maintain all certifications, standards, and job knowledge skills and abilities as required by their position, minimal accepted performance standards, and immediate supervisor.

**HOUSTON FIRE DEPARTMENT PATIENT CARE GUIDELINES: Volume III, Reference III-01:**

**Section 6.21 – Riding in Charge:** B (5) The FFP is responsible for the complete and accurate documentation of EMS records including the patient care record and documentation of patient refusals. The EOP shall review the patient care record.

**Section 7.01 – Patient Assessment:** B. Primary Survey (1) Circulation: Assess the circulation/perfusion

- Assess rate and quality of pulses, peripheral and central pulses
- No spontaneous pulses, begin chest compressions at an appropriate rate and depth
- Assess skin color, temperature, and capillary refill
- A patient who is unresponsive and has either no breathing or no normal breathing (only gasping) is presumed to be pulseless and CPR should be started immediately without a pulse check being performed.

**Section 8.02 – Cardiac Arrest Emergencies:** A (2) BLS/ALS Level- The electronic information captured by AED or ALS monitor is

Firefighters' & Police Officers'
Civil Service Commission of the
City of Houston
Re: Joe Spradlin
Page 3

considered part of the quality improvement process and shall be downloaded from each ALS monitor and AED to HED EMS headquarters for each case requiring CPR, electroshock therapy, 12 lead ECG, or intubation.

C (1) The femoral pulse check during analysis should be performed so as to not interfere with the analysis. If a pulse is felt, resume rescue breathing and obtain a blood pressure. Reconfirm the pulse every minute.

15

By his misconduct hereinafter detailed, FF Williams has also violated certain provisions of the rules and regulations of HFD and made applicable herein under Rule 13, Section 6, set forth above, of the Firemen's and Policemen's Civil Service Commission rules governing the Fire Department. FF Williams had access to a copy of the COH Civil Service Commission Rules Governing Members of the Fire and Police Departments as well as HFD rules and regulations and was required to have read and conducted himself by, and in accordance with, said rules and regulations.

The specific provisions of the Houston Fire Department (HFD) Rules and Regulations in which FF Williams has violated include, but are not limited to:

**HOUSTON FIRE DEPARTMENT GUIDELINES - RULES AND REGULATIONS: Volume 1, Reference 1-01:**

**Section 5.13 – Performance of Duty:** Members shall be prepared and able to perform all lawful duties as defined by their position. Members shall maintain all certifications, standards, and job knowledge skills and abilities as required by their position, minimal accepted performance standards, and immediate supervisor.

**HOUSTON FIRE DEPARTMENT PATIENT CARE GUIDELINES: Volume III, Reference III-01:**

**Section 6.21 – Riding in Charge:** B (5) The FFP is responsible for the complete and accurate documentation of EMS records including the patient care record and documentation of patient refusals. The EOP shall review the patient care record.

**Section 7.01 – Patient Assessment:** B. Primary Survey (1) Circulation: Assess the circulation/perfusion

- Assess rate and quality of pulses, peripheral and central pulses
- No spontaneous pulses, begin chest compressions at an appropriate rate and depth
- Assess skin color, temperature, and capillary refill
- A patient who is unresponsive and has either no breathing or no normal breathing (only gasping) is presumed to be pulseless and CPR should be started immediately without a pulse check being performed.

**Section 8.02 – Cardiac Arrest Emergencies:** A (2) BLS/ALS Level- The electronic information captured by AED or ALS monitor is

considered part of the quality improvement process and shall be downloaded from each ALS monitor and AED to HED EMS headquarters for each case requiring CPR, electroshock therapy, 12 lead ECG, or intubation.

C (1) The femoral pulse check during analysis should be performed so as to not interfere with the analysis. If a pulse is felt, resume rescue breathing and obtain a blood pressure. Reconfirm the pulse every minute.

## Violation of EMS Rules and Protocols by Defendants Williams and Spradlin

73. Upon information and belief, as HFD EMS personnel, Defendant Williams and Defendant Spradlin are bound by provisions of the Texas Administrative Code ("TAC"), HFD Patient Care Guidelines, and well as Standing Orders for Basic Life Support ("BLS") and Advanced Life Support ("ALS").[3]

## Violation for Failure to Immediately Initiate CPR

74. Defendant Williams and Defendant Spradlin violated 25 TAC § 157.36(b)(8) as well as provisions of 7.01, 7.05 and 8.02 of the HFD Patient Care Guidelines and Standing Orders for BLS and ALS Units.

75. The primary assessment protocols outlined in Guideline 7.01 include explicit protocols for a patient found unresponsive, pulseless, or with absent breath sounds.

76. Specifically, 7.01(B)(1) states that "a patient who is unresponsive and has either no breathing or no normal breathing (only gasping) is presumed to be pulseless, and CPR should be started immediately without a pulse check being performed."

Basic Life Support Sequence C-A-B: Evaluate the Circulation, Airway and Breathing, then neurologic Disability and Physical Exam. Priorities of management are established on a life threat basis. NOTE: In children < 8 years old, the priority is Airway-Breathing-Circulation.

1. Circulation: Assess the circulation / perfusion
   - Assess rate and quality of pulses – peripheral and central pulses.
   - No spontaneous pulses – begin chest compressions at an appropriate rate and depth.
   - Assess skin color, temperature, and capillary refill.
   - A patient who is unresponsive and has either no breathing or no normal breathing (only gasping) is presumed to be pulseless and CPR should be started immediately without a pulse check being performed.

[3] According to HFD Patient Care Guidelines provision 4.00 "these guidelines apply to all members of the Houston Fire Department while on duty. Each member shall perform to his/her level of authorization and credentialing within the HFD System."

77. 7.01 (B)(3) states that when respiration is absent, EMS personnel should "ventilate with an appropriately sized supraglottic airway or insert an oral airway and bag-valve-mask ventilate and provide 100 percent oxygenation."

3. Breathing: Assess respirations (rate, depth, and work of breathing, quality of breath sounds). Provide oxygen. If the respirations are:
   •Spontaneous – observe the chest rise and fall, auscultate breath sounds posteriorly first (beginning at the bases, moving superiorly), then anteriorly.
   •Labored – observe for signs of distress – use of secondary muscles, cyanosis, or tachypnea. Never withhold oxygen from a patient in distress.
   – Administer 100% oxygen via non-rebreather for all patients in respiratory distress.
   – Nasal cannula @ 2-4 L/min., titrating to an $O_2$ saturation of ≥ 94% for patients who will not tolerate a mask or as dictated by guideline (Chest Pain, Stroke).
   – Agonal breathing – BVM with 100% oxygen and advanced airway as indicated.
   •Absent – Ventilate with an appropriately sized supraglottic airway or insert an oral airway and bag-valve-mask ventilate and provide 100% oxygenation. Whenever possible, two persons should operate a bag-valve-mask; one to ensure a good mask-to-face seal and the other to perform proper ventilation technique.

78. Guideline 7.01 also states a primary assessment may be interrupted in life-threatening emergencies or when there is a need for CPR.

79. Specific protocols for cardiac arrest emergences are outlined in Guideline 8.02.

80. General principles for cardiac arrest emergencies are set out in 8.02(A). These include instructions for initiating chest compressions and airway management.

81. 8.02(A)(2) states that resuscitation efforts may be withheld only if the patient has a State of Texas Pre-Hospital (Out of Hospital) DNR order or if the patient meets the "obviously dead" criteria.

82. The "obviously dead" criteria are: 1) Dead-on Arrival (DOA) (decapitation, rigor mortis, dependent lividity, decomposition, incineration, obvious mortal wounds; 2) absence of any signs of life (pulse, respirations, or any spontaneous movement) on EMS arrival association with a penetrating head injury (GSW, stab, etc.) or penetrating extremity injury with obvious exsanguination; 3) absence of any signs of life (pulse, respirations or any spontaneous movement) on EMS arrival for greater than 10 minute transport time to a Trauma Center or 4) absence of any

signs of life (pulse, respirations, or any spontaneous movement) on EMS arrival associated with blunt trauma.

83. The flowchart guidelines for a pulseless patient under 8.02(C) clearly and explicitly show that upon determining that a patient is unresponsive with absent or not normal breathing one member of the EMS team should immediately begin uninterrupted chest compressions while the other begins setting up the automated external defibrillator (AED) and ventilates the patient.

84.    At this this point, the EMS personnel should then enter a cycle of checking and potentially shocking the cardiac rhythm with the AED and administering CPR.

85.    This cycle should continue until the arrival of an Advanced Life Saving (ALS) team.

86.    The 8.02 flowchart guidelines, the primary examination protocols, and the cardiopulmonary resuscitation guidelines in 7.05 all state that upon determining the patient is pulseless or unresponsive, EMS personnel should *immediately* initiate CPR and maintain continuous chest compressions.

87.    Defendants Williams and Spradlin did not follow the protocol required by the Guidelines.

88.    Despite having found J.J. unresponsive and without normal breathing, Defendant Williams and Defendant Spradlin did not immediately initiate CPR as required by 7.01(B)(1). Instead, Defendant Williams and Defendant Spradlin performed a pulse check.

89.    However, when no pulse or respiration were found, the Defendants again failed to initiate CPR.

90.    Defendants did not inquire about a DNR and J.J. did not meet the "obviously dead" criteria; there were no life-threatening wounds, no rigor mortis, and no dependent lividity.

91.    Additionally, Ms. Williams informed the Defendants that J.J had been responsive as recently as 30 minutes prior to their arrival she had given J.J. medication by mouth and suctioned him.

92.    Under the guidelines addressed in the TAC, Defendants had no grounds on which to withhold resuscitation efforts.

93.     Shockingly, Defendants withheld resuscitation efforts even as Ms. Williams repeatedly begged them to save J.J.

94.     Defendants also withheld resuscitation efforts when J.J showed signs of life by vomiting.

95.     Only when the second EMS unit arrived was any medical care provided to J.J at all, specifically chest compressions and CPR.

96.     This means that J.J. went without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

**Violation of Protocol for Delay in Transporting J.J. to the Hospital**

97.     Defendant Williams and Defendant Spradlin violated 25 TAC § 157.36 (b)(8) and (38) and provisions 6.03, 6.12, 6.16 and Table 6-2 of the HFD Patient Care Guidelines and Standing Orders for BLS and ALS Units.

98.     25 TAC § 157.36(b)(38) states that EMS personnel may be subject to disciplinary action for "failing to transport a patient and/or transport a patient to the appropriate medical facility according to the criteria for selection of a patient's destination established by the medical director."

99.     The criteria by the medical director can be found in the HFD Patient Care Guidelines and Standing Orders for BLS and ALS Units under Guidelines 6.12 and Table 6-2.

100.    Guideline 6.16 for non-transports state that "Members of the Houston Fire Department are not to refuse transport." The only exception is if the patient refuses care, which must be thoroughly documented by the EMS personnel and reviewed with the EMS supervisor.

101.    Guideline 6.16(D) also states that "ambulance personnel shall not refuse transportation for patients to the hospital" and that it is a violation of the policy for any EMT or

paramedic to refuse to transport "any sick or injured person from the place of emergency or the place of a direct call to which he/she has responded."

D. EMS Initiated Non-Transport
Ambulance personnel shall not refuse transportation for patients to a hospital. It is therefore a violation of this policy:

1. For any EMT or Paramedic to refuse transportation for any sick or injured person from the place of an emergency or the place of a direct call to which he/she has responded. The circumstances that such person is or appears to be indigent and unable to pay the cost of such service shall not serve as an excuse from this requirement. Utilization of non-fire department vehicles is acceptable under applicable departmental policy.

102. For a pediatric patient, refusals "can only be made by legally designated guardians, not by EMS personnel."

103. The initial non-transport by EMS personnel is a shocking violation of these protocols in light of the fact Ms. Williams did not refuse care for J.J in any way; in fact, she was actively begging for EMS personnel to provide care to J.J.

104. Once transport has been initiated, protocol for communications in Guidelines 6.03 state that Base Station should be contacted prior to all emergency transports and informed of the patient's transport code.

105. 6.03(D) states that contact with an EMS supervisor is only necessary if the unit is having "problems or conflicts with communications."

106. The Guidelines for Emergency Ambulance Routing at 6.12(B) state that Base Station should be contacted prior to transport to determine the most appropriate transport decision.

107. However, 6.12 (B)(3) states that "Emergency Ambulance Routing does not alter the current transport guidelines for trauma, cardiac arrest, stroke, acute MI or seriously ill pediatric patients."

108. Guidelines 6.12(C)(2) also state that a non-trauma patient with a life-threatening condition such as CPR in progress should be taken "to the nearest approved medical facility."

2. Transport emergent patients (life threatening condition) to the nearest medical facility capable of handling the patient's problem. Take patients with non-trauma related CPR in progress, an inability to obtain an advanced airway in patients who require one, or any life threatening condition to the nearest approved medical facility. Pediatric patients with moderate or serious illness (not meeting above criteria) should be transported to hospitals with Pediatric ICU facilities (*Ref. 9.05*).

109. The Emergency Ambulance Routing Guidelines at 6.12 also refer to Table 6-2 Hospital Destination Decision, a guideline flowchart that shows a patient with no trauma who is pulseless should be routed to the "Nearest Appropriate Hospital or Field Termination if appropriate."



110. As termination of resuscitation would not be appropriate per Guidelines 6.22, which require permission by a Base Station physician, protocol states the patient should have been transported to the nearest appropriate hospital.

111. "Appropriate facility" is defined in Guidelines 3.06 as "[a] hospital facility with staffing, equipment, and services to care for the patient.

112.    There is no indication that EMS personnel believed Memorial Hermann, 1.5 miles away from the scene, was not an appropriate facility.

113.    Here, proper protocol would have been to contact the Base Station to determine the appropriate destination and immediately transport J.J.

114.    There is no explanation provided to justify the delay in transporting J.J; there was an appropriate facility less than two miles away that was able to receive and care for him.

115.    There is also no explanation given for why Defendant Williams informed Ms. Williams that he had to contact his supervisor for approval when protocol states this is only necessary if there is a problem communicating with Base Station.

116.    The EMS records do not mention the delay nor any discussion with an EMS supervisor.

117.    If Defendant Williams and Defendant Spradlin had been following the provisions as outlined in  the Texas Administration Code, HFD Patient Care Guidelines, as well as Standing Orders for Basic Life Support ("BLS") and Advanced Life Support ("ALS") they would have provided medical attention to J.J.

118.    As a result of their non-compliance with the Texas Administrative Code, HFD Patient Care Guidelines, and well as Standing Orders for Basic Life Support ("BLS") and Advanced Life Support ("ALS") J.J.'s serious medical condition worsened.

119.    While not determinative of the standard of care owed, the Texas Administrative Code, HFD Patient Care Guidelines, and well as Standing Orders for Basic Life Support ("BLS") and Advanced Life Support ("ALS") provides probative value of what constitutes reasonable conduct by Defendants Williams and Defendant Spradlin.

120.    These injuries were not caused by any other means.

**IV.**
**CAUSES OF ACTION**

**COUNT I**

Substantive Due Process Violation
Violation of the 14th Amendment Pursuant to 42 USC § 1983
(Against Defendants Williams and Spradlin)

121. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

122. It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. *West v. Atkins*, 487 U.S. 42, 49–50, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988).

123. The Supreme Court explained that substantive due process is violated by executive action "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998)).

124. Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Doe* 675 F.3d at 867.

125. Here, Defendant Williams and Defendant Spradlin acted with a degree of culpability that shocks the conscious as they failed to provide any life-saving measures at all to J.J., specifically by refusing to administer CPR and chest compressions.

126. It was known to Defendant Williams and Defendant Spradlin that J.J. had a serious medical need in that Defendants claimed J.J. was non-responsive and had no pulse yet the Defendants acted with conduct that shocks the conscience knowing that would pose a substantial risk of serious medical harm when they deliberately refused to perform CPR and chest compressions.

127. J.J. went without life-saving treatment, specifically CPR and chest compressions for over nine minutes from when Defendants in Unit M063 initially responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

128. Interestingly, according to Defendant Spradlin's disciplinary file: "Spradlin reported that they moved the patient and equipment to the living room. Spradlin stated, "I was on the floor performing CPR on the patient when I used my handheld radio to call for a 7-10 page requesting E063 return to the scene. Once on the floor I immediately began performing CPR while Andy [Defendant Willaims] inserted a #3 iGel and got the BVM to begin ventilating the patient. Spradlin reported he believed from the time M063 entered the room until CPR was being performed was less than 2 minutes. "

129. However, according to Defendant Spradlin and Defendant Willaims' disciplinary file "the download from the LifePak 15 assigned to M063 during this incident showed the monitor was turned on at 1:08:52, was connected to a patient at 1:10:18 and that CPR began at 1:15:00. Assistant Medical Director Chris Souders reported although the LifePak clock is not synced directly with the CAD clock, clear evidence exists that the monitor was placed on the patient in asystole and CPR was not initiated for 5 minutes. Furthermore, the PCR narrative did not indicate the paramedics initially considered the patient DOA nor record any reason for the delay in initiating CPR."

130.    Therefore, upon information and belief Defendants fabricated what time CPR was performed on J.J in order to cover up their unjustifiable conduct as despite claiming CPR was performed within less than two minutes upon Defendants' arrival, the true facts are that J.J. went without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

131.    Defendant Williams' and Defendant Spradlin's conduct was unjustifiable by any government interest and rose to the level that shocks the conscience.

132.    Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the events that form the basis of this lawsuit.

133.    Notably, the Professional Standards Office sustained policy violations including: 1) Section 5.13 Performance of Duty; 2) Section 6.06 Documentation; 3) Section 6.21 Riding in Charge; 4) Section 7.01 Patient Assessment; and 5) Section 8.2 Cardiac Arrest Emergencies.

134.    Defendant Williams and Defendant Spradlin were acting under color of state law when they abused the position given to them by the State as licensed emergency medical professionals by deliberately refusing to perform CPR and chest compressions despite being aware of J.J. serious medical needs.

135.    Due to the failure of Defendant Williams and Defendant Spradlin to administer life saving measures such as chest compressions and CPR, J.J did not receive proper, timely or effective emergency medical care.

136.    As a result of Defendant Williams and Defendant Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions, J.J experienced an unnecessary and prolonged period without oxygen.

137. As a result of Defendants Williams and Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions J.J. suffered brain damage due to the extended period of lack of oxygen.

138. Prior to the incident that forms the basis of this lawsuit. J.J. ate and took medicine through his mouth and had a tube only for liquids.

139. J.J can no longer eats regularly and needs to be fed through a tube.

140. J.J is also not as responsive and merely rocks back and forth.

141. J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

142. This is a case where Defendants as trained paramedics elected to do nothing in response to a known health risk.

143. These injuries were not caused by any other means.

**COUNT II**

Substantive Due Process Violation
Violation of the 14th Amendment Pursuant to 42 USC § 1983
(Against Defendants Williams and Spradlin)

144. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

145. It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. *West v. Atkins*, 487 U.S. 42, 49–50, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988).

146. The Supreme Court explained that substantive due process is violated by executive action "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849,

867 (5th Cir. 2012) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998)).

147.    Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Doe* 675 F.3d at 867.

148.    Here, Defendant Williams and Defendant Spradlin acted with a degree of culpability that shocks the conscious as they failed to provide crucial life-saving measures to J.J., specifically by <u>deliberately delaying is transport to the hospital when he was still in a state of medical distress</u>.

149.    It was known to Defendant Williams and Defendant Spradlin that J.J. had a serious medical need in that Defendants claimed J.J. was non-responsive and had no pulse yet the Defendants acted with conduct that shocks the conscience knowing that would pose a substantial risk of serious medical harm when they deliberately delayed transporting J.J. to the hospital when he was still in a state of medical distress.

150.    Upon information and belief Defendants fabricated what time they left the scene and arrived at the hospital in order to conceal the fact that they delayed transporting J.J to the hospital as they loaded up J.J in the back of their vehicle when AS-30 arrived on scene at 1:23 and did not leave for the hospital until 1:47 a.m. when A064 arrived to assist with transport to the hospital.

151.    This harmfully delayed J.J.'s transport to an ER for approximately twenty-four minutes.

152.    The ambulance did not arrive at Memorial Hermann Northeast Hospital until 1:52 a.m. despite being less than two miles away from the hospital.

153.    Hospital staff at Memorial Hermman Hospital immediately initiated CPR and successfully resuscitated J.J. at 2:04 a.m.

154.    Defendant Williams' and Defendant Spradlin's conduct was unjustifiable by any government interest and rose to the level that shocks the conscience.

155.    Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the events that form the basis of this lawsuit.

156.    Notably, the Professional Standards Office sustained policy violations including: 1) Section 5.13 Performance of Duty; 2) Section 6.06 Documentation; 3) Section 6.21 Riding in Charge; 4) Section 7.01 Patient Assessment; and 5) Section 8.2 Cardiac Arrest Emergencies.

157.    Due to the delay in Defendant Williams and Defendant Spradlin transporting J.J. to the hospital, J.J did not receive proper, timely or effective emergency medical care.

158.    As a result of Defendant Williams and Defendant Spradlin's deliberate decision to delay transporting J.J. to the hospital, J.J experienced an unnecessary and prolonged period without oxygen.

159.    As a result of Defendants Williams and Spradlin's deliberate decision to delay transporting J.J. to the hospital, J.J. suffered brain damage due to the extended period of lack of oxygen.

160.    Prior to the incident that forms the basis of this lawsuit, J.J. ate and took medicine through his mouth and had a tube only for liquids.

161. J.J can no longer eats regularly and needs to be fed through a tube.

162. J.J is also not as responsive and merely rocks back and forth.

163. J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

164. This is a case where Defendants as trained paramedics elected to do nothing in response to a known health risk.

165. These injuries were not caused by any other means.

**COUNT III**

State Created Danger
Violation of the 14th Amendment Pursuant to 42 USC § 1983
(Against Defendants Williams and Spradlin)

166. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

167. The Supreme Court has long recognized that the Due Process Clause is more than a guarantee of procedural fairness and cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

168. "When a plaintiff complains of abusive executive action, substantive due process is violated 'only when [the conduct] can properly be characterized as arbitrary, or conscience shocking in a constitutional sense." *County of Sacramento*, 523 U.S. at 847, 118 S.Ct. 1708.

169. "While it is clear that individuals have a substantive due process right to be free from state-occasioned bodily harm, it is equally clear that the Constitution does not, as a general

matter, impose upon state officials a duty of care to protect individuals from any and all private harms." *DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.")).

170. There are two possible exceptions to this general rule rooted in the language of *DeShaney*. *Id.*

171. First, under the "special relationship" exception, "the Constitution imposes upon the state a duty of care towards individuals who are in the custody of the state." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. 998) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.")

172. To create a special relationship with a citizen, a governmental entity must, "through an established set of laws and procedures, render[ ] the person in its care completely unable to provide for his or her basic needs and ... assume[ ] a duty to provide for these needs." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 859 (5th Cir. 2012).

173. Second, "some language from *DeShane*y has been read to suggest that state officials also have a duty to protect individuals from harm when their actions created or exacerbated a danger to the individual." *Breen*, 485 F.3d at 333 (citing *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998 ("While the State may have been aware of the dangers that [plaintiff] faced in the world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.")). This latter exception mentioned in *DeShaney* is often recognized as the primary source for what has been termed the state created danger theory. *Id.*

174. In any event, a plaintiff must allege facts showing that the state actor placed the plaintiff in a "worse position than that in which he would have been had [state actor] not acted at all." *DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

175. Courts applying the "special relationship" exception to the *DeShaney* rule "have generally required plaintiffs to demonstrate ... that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." *McClendon v. City of Columbia*, 305 F.3d 314, 326 (To succeed on a deliberate indifference to medical care claim, a plaintiff must show that a state actor knew of and disregarded an excessive risk to the victim's health or safety. *McClendon*, 305 F.3d at 326 n.8. "The state actor's actual knowledge [of a serious medical need] is critical to the inquiry." *Id.*

176. A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwel*l, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

177. Prior to *Scanlan v. Texas A & M Uni*versity, 343 F.3d 533 (5th Cir.2003), the Fifth Circuit had not adopted the state-created danger theory and had "often expressed reluctance to embrace the state-created danger theory, while noting its adoption in other courts." *Breen*, 485 F.3d at 333–34.

178. In *Breen*, the Fifth Circuit acknowledged that the Fifth Circuit in *Scanlon v. Texas A & M Universit*y, 343 F. 3d 533 (5th Cir. 2003), recognized a state-created danger right to relief in reversing a Rule 12 (b)(6) dismissal. *Id.*

179. According to the Court in *Breen*, "because the necessary implication of the Scanlan court's decision is that the state-created danger theory is, indeed, a valid basis for a claim on the

set of facts alleged in the complaints in these cases, that clear implied holding is the law of the case in the present group of appeals." *Id.*

180. A constitutional right is clearly established if "at the time of an official's challenged conduct, the contours of the right in question are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' *Id.*

181. "Clearly established" does not, however, "refer to commanding precedent that is factually on all-fours with the case at bar, or that holds the very action in question unlawful." *Breen*, at 338-39 (internal quotation omitted); see also *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.' ") (quoting *U.S. v. Lanier*, 520 U.S. 259,263 (1997)).

182. [A] right can become clearly established either through cases that constitute binding authority or on the basis of a consensus of persuasive cases from other jurisdictions." *Breen*, at 339 (citing *McLendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002)).

183. A number of courts, including the majority of the federal circuits, have adopted the state-created danger theory of section 1983 liability in one form or another. *Id*. at 333.

184. To recover on a state-created danger claim, a plaintiff must show: (1) the defendant created or increased the danger to the plaintiff, a known victim; and (2) the defendant was deliberately indifferent to that danger. *Id.* at 334-35.

185. "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself or cutting off potential sources of private aid." *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994).

186. "In examining whether an officer affirmatively places an individual in danger, [the Court] do[es] not look solely to the agency of the individual ... [or] what options may or may not have been available to [her]." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). "Instead, [the Court] examine[s] whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Id*; *see also Kennedy,* 439 F.3d at 1064 n.5 (recognizing relevant inquiry is whether state action "le[ft] [the plaintiff] in a situation more dangerous than the one she already faced."

187. In *Penilla,* an instructive Ninth Circuit case, two police officers responded to a 911 call after a man fell seriously ill on his front porch. *Penilla v. City of Huntington Park*, 115 F.3d 707, 708 (9th Cir.1997).

188. After the defendant police officers arrived first, examined him, and found him to be in a grave need of medical are, they cancelled the request for paramedics and instead moved the man inside his home, locked the door and left. *Id*. at 708.

189. The following day, the man's family members found him dead on the floor inside his home, the result of respiratory failure. *Id*.

190. The court held there was a question of material fact as to the officers' disregard and allowed a section 1983 claim to proceed at trial. *Id*.

191. Specifically, because the officers took affirmative actions that significantly increased the risk facing Penilla, knowing that he needed medical attention, the court held that the police acted with deliberate indifference and "clearly placed Penilla in a more dangerous situation than the one in which they found him." *Id*. at 710.

192.    Like the officers in *Penilla*, Defendant Williams and Defendant Spradlin knew that J.J. was in a grave condition but still inexplicably affirmatively denied him medical care. *Id*. at 708.

193.    It was known to Defendant Williams and Defendant Spradlin that J.J. was in grave condition in that Defendants claimed J.J. was non-responsive and had no pulse yet the Defendants refused to give life-saving measures like CPR or chest compressions.

194.    Defendants made the situation decidedly worse by calling off medical assistance already en route by disregarding Unit E063. *Penilla*, 115 F.3d at 708.

195.    When Ms. Williams, panic-stricken, scooped J.J. from the hotel bed and told Defendant Williams and Defendant Spradlin that she would take J.J. to the hospital herself in an attempt to save him; Defendant Williams responded by asking if Ms. Williams wanted him and Defendant Spradlin to do CPR.

196.    Defendant Williams moved J.J. from the bed to the floor in preparation for CPR.

197.    According to Defendant Spradlin's disciplinary report: "EO Spradlin reported the mother went over to her son and attempted to pick him up, stating "well, then I'll just take him myself." "EO Spradlin stated, "I then told Andy [Defendant Williams] that we were going to have to work him."

198.    Moving J.J. from the bed to the floor in preparation for CPR demonstrates that Defendant Williams and Defendant Spradlin were aware of J.J.'s medical needs, specifically that he needed critical life-saving measures such as CPR and chest compressions.

199.    However, Defendants Williams and Spradlin did not administer CPR nor provide any medical attention at all to J.J. after moving him from the bed to the floor; thus, again making

the situation decidedly worse by cutting off Ms. Williams' attempt to secure life-saving aide for J.J. *Id*. at 708.

200. J.J. went without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 initially responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

201. Interestingly, according to Defendant Spradlin's disciplinary file: "Spradlin reported that they moved the patient and equipment to the living room. Spradlin stated, "I was on the floor performing CPR on the patient when I used my handheld radio to call for a 7-10 page requesting E063 return to the scene. Once on the floor I immediately began performing CPR while Andy [Defendant Willaims] inserted a #3 iGel and got the BVM to begin ventilating the patient. Spradlin reported he believed from the time M063 entered the room until CPR was being performed was less than 2 minutes. "

202. However, according to Defendant Spradlin and Defendant Willaims' disciplinary file "the download from the LifePak 15 assigned to M063 during this incident showed the monitor was turned on at 1:08:52, was connected to a patient at 1:10:18 and that CPR began at 1:15:00. Assistant Medical Director Chris Souders reported although the LifePak clock is not synced directly with the CAD clock, clear evidence exists that the monitor was placed on the patient in asystole and CPR was not initiated for 5 minutes. Furthermore, the PCR narrative did not indicate the paramedics initially considered the patient DOA nor record any reason for the delay in initiating CPR."

203. Therefore, upon information and belief Defendants fabricated what time CPR was performed on J.J in order to cover up their unjustifiable conduct as despite claiming CPR was performed within less than two minutes upon Defendants' arrival the true facts are that J.J. went

without life-saving treatment, specifically CPR and chest compressions for nine minutes from when Defendants in Unit M063 responded to the scene at 1:06 a.m. until paramedics in Unit E063 initiated CPR at 1:15 a.m.

204.   Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the events that form the basis of this lawsuit.

205.   Notably, the Professional Standards Office sustained policy violations including: 1) Section 5.13 Performance of Duty; 2) Section 6.06 Documentation; 3) Section 6.21 Riding in Charge; 4) Section 7.01 Patient Assessment; and 5) Section 8.2 Cardiac Arrest Emergencies.

206.   Defendant Williams and Defendant Spradlin were acting under color of state law when they abused the position given to them by the State as licensed emergency medical professionals by deliberately refusing to perform CPR and chest compressions despite being aware of J.J. serious medical needs.

207.   Due to the failure of Defendant Williams and Defendant Spradlin to administer life saving measures such as chest compressions and CPR, J.J did not receive proper, timely or effective emergency medical care.

208.   As a result of Defendant Williams and Defendant Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions, J.J experienced an unnecessary and prolonged period without oxygen.

209.   As a result of Defendants Williams and Spradlin's deliberate decision to not administer life-saving measures such as CPR and chest compressions J.J. suffered brain damage due to the extended period of lack of oxygen.

210.   Prior to the incident that forms the basis of this lawsuit. J.J. ate and took medicine through his mouth and had a tube only for liquids.

211. J.J can no longer eats regularly and needs to be fed through a tube.

212. J.J is also not as responsive and merely rocks back and forth.

213. J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

214. This is a case where Defendants as trained paramedics elected to do nothing in response to a known health risk.

215. These injuries were not caused by any other means.

**COUNT IV**

State Created Danger
Violation of the 14th Amendment Pursuant to 42 USC § 1983
(Against Defendants Williams and Spradlin)

216. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

217. The Supreme Court has long recognized that the Due Process Clause is more than a guarantee of procedural fairness and cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

218. "When a plaintiff complains of abusive executive action, substantive due process is violated 'only when [the conduct] can properly be characterized as arbitrary, or conscience shocking in a constitutional sense." *County of Sacramento*, 523 U.S. at 847, 118 S.Ct. 1708.

219. "While it is clear that individuals have a substantive due process right to be free from state-occasioned bodily harm, it is equally clear that the Constitution does not, as a general

matter, impose upon state officials a duty of care to protect individuals from any and all private harms." *DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.")).

220. There are two possible exceptions to this general rule rooted in the language of *DeShaney*. *Id.*

221. First, under the "special relationship" exception, "the Constitution imposes upon the state a duty of care towards individuals who are in the custody of the state." *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. 998) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.")

222. To create a special relationship with a citizen, a governmental entity must, "through an established set of laws and procedures, render[ ] the person in its care completely unable to provide for his or her basic needs and ... assume[ ] a duty to provide for these needs." *Covington Cty*., 675 F.3d at 859.

223. Second, "some language from *DeShane*y has been read to suggest that state officials also have a duty to protect individuals from harm when their actions created or exacerbated a danger to the individual." *Breen*, 485 F.3d at 333 (citing *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998 ("While the State may have been aware of the dangers that [plaintiff] faced in the world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.")). This latter exception mentioned in *DeShaney* is often recognized as the primary source for what has been termed the state created danger theory. *Id.*

224. In any event, a plaintiff must allege facts showing that the state actor placed the plaintiff in a "worse position than that in which he would have been had [state actor] not acted at all." *DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

225. Courts applying the "special relationship" exception to the *DeShaney* rule "have generally required plaintiffs to demonstrate ... that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." *McClendon v. City of Columbia*, 305 F.3d 314, 326 (To succeed on a deliberate indifference to medical care claim, a plaintiff must show that a state actor knew of and disregarded an excessive risk to the victim's health or safety. *McClendon*, 305 F.3d at 326 n.8. "The state actor's actual knowledge [of a serious medical need] is critical to the inquiry." *Id.*

226. A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwel*l, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

227. Prior to *Scanlan v. Texas A & M Uni*versity, 343 F.3d 533 (5th Cir.2003), the Fifth Circuit had not adopted the state-created danger theory and had "often expressed reluctance to embrace the state-created danger theory, while noting its adoption in other courts." *Breen*, 485 F.3d at 333–34.

228. In *Breen*, the Fifth Circuit acknowledged that the Fifth Circuit in *Scanlon v. Texas A & M Universit*y, 343 F. 3d 533 (5th Cir. 2003), recognized a state-created danger right to relief in reversing a Rule 12 (b)(6) dismissal. *Id.*

229. According to the Court in *Breen*, "because the necessary implication of the Scanlan court's decision is that the state-created danger theory is, indeed, a valid basis for a claim on the

set of facts alleged in the complaints in these cases, that clear implied holding is the law of the case in the present group of appeals." *Id.*

230. A constitutional right is clearly established if "at the time of an official's challenged conduct, the contours of the right in question are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' *Id.*

231. "Clearly established" does not, however, "refer to commanding precedent that is factually on all-fours with the case at bar, or that holds the very action in question unlawful." *Breen*, at 338-39 (internal quotation omitted); see also *Hope*, 536 U.S. at 741 ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.' ") (quoting *U.S. v. Lanier*, 520 U.S. 259,263 (1997)).

232. [A] right can become clearly established either through cases that constitute binding authority or on the basis of a consensus of persuasive cases from other jurisdictions." *Breen*, at 339 (citing *McLendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002)).

233. A number of courts, including the majority of the federal circuits, have adopted the state-created danger theory of section 1983 liability in one form or another. *Id*. at 333.

234. To recover on a state-created danger claim, a plaintiff must show: (1) the defendant created or increased the danger to the plaintiff, a known victim; and (2) the defendant was deliberately indifferent to that danger. *Id.* at 334-35.

235. "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself or cutting off potential sources of private aid." *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994).

236.   "In examining whether an officer affirmatively places an individual in danger, [the Court] do[es] not look solely to the agency of the individual ... [or] what options may or may not have been available to [her]." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). "Instead, [the Court] examine[s] whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Id*; see also *Kennedy*, 439 F.3d at 1064 n.5 (recognizing relevant inquiry is whether state action "le[ft] [the plaintiff] in a situation more dangerous than the one she already faced."

237.   In *Penilla,* an instructive Ninth Circuit case, two police officers responded to a 911 call after a man fell seriously ill on his front porch. *Penilla v. City of Huntington Park*, 115 F.3d 707, 708 (9th Cir.1997).

238.   After the defendant police officers arrived first, examined him, and found him to be in a grave need of medical are, they cancelled the request for paramedics and instead moved the man inside his home, locked the door and left. *Id*. at 708.

239.   The following day, the man's family members found him dead on the floor inside his home, the result of respiratory failure. *Id*.

240.   The court held there was a question of material fact as to the officers' disregard and allowed a section 1983 claim to proceed at trial. *Id*.

241.   Specifically, because the officers took affirmative actions that significantly increased the risk facing Penilla, knowing that he needed medical attention, the court held that the police acted with deliberate indifference and "clearly placed Penilla in a more dangerous situation than the one in which they found him." *Id*. at 710.

242.    Like the officers in *Penilla*, Defendant Williams and Defendant Spradlin knew that J.J. was in a grave condition but still inexplicably affirmatively denied him medical care. *Id*. at 708.

243.    Defendant Williams and Defendant Spradlin moved J.J to an isolated place out of the public's view when they loaded him in the back of the Medic and deliberately delayed transporting him to the hospital when he was still in a state of medical distress.

244.    Upon information and belief Defendants fabricated what time they left the scene and arrived at the hospital in order to conceal the fact that they delayed transporting J.J to hospital as they loaded up J.J in the back of their vehicle when AS-30 arrived on scene at 1:23 and did not leave for the hospital until 1:47 a.m. when A064 arrived to assist with transport to the hospital.

245.    This harmfully delayed J.J.'s transport to an ER for approximately twenty-four minutes.

246.    The ambulance did not arrive at Memorial Hermann Northeast Hospital until 1:52 a.m. despite being less than two miles away from the hospital.

247.    Hospital staff at Memorial Hermman Hospital immediately initiated CPR and successfully resuscitated J.J. at 2:04 a.m.

248.    Defendant Spradlin and Defendant Williams were suspended for seven days following an investigation into the events that form the basis of this lawsuit.

249.    Notably, the Professional Standards Office sustained policy violations including: 1) Section 5.13 Performance of Duty; 2) Section 6.06 Documentation; 3) Section 6.21 Riding in Charge; 4) Section 7.01 Patient Assessment; and 5) Section 8.2 Cardiac Arrest Emergencies.

250.    Due to the delay in Defendant Williams and Defendant Spradlin transporting J.J. to the hospital, J.J did not receive proper, timely or effective emergency medical care.

251.  As a result of Defendants Williams and Spradlin's decision to delay transporting J.J. to the hospital, J.J experienced an unnecessary and prolonged period without oxygen.

252.  As a result of Defendants Williams and Spradlin's deliberate decision to delay transporting J.J. to the hospital, J.J. suffered brain damage due to the extended period of lack of oxygen.

253.  Prior to the incident that forms the basis of this lawsuit. J.J. ate and took medicine through his mouth and had a tube only for liquids.

254.  J.J can no longer eats regularly and needs to be fed through a tube.

255.  J.J is also not as responsive and merely rocks back and forth.

256.  J.J.'s serious medical conditions worsened as a result of the conduct outlined by Defendant Williams and Defendant Spradlin.

257.  This is a case where Defendants as trained paramedics elected to do nothing in response to a known health risk.

258.  These injuries were not caused by any other means.

## V.
## EXEMPLARY DAMAGES

259.  Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

260.  When viewed objectively from the standpoint of Defendant Williams and Defendant Spradlin, at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

261.  As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Williams and Defendant Spradlin, Plaintiff is entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court.

**VI.**
**DAMAGES**

262. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

263. J.J.'s injuries were a foreseeable event. Those injuries were directly and proximately caused by Defendant Williams and Defendant Spradlin's conduct.

264. As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to J.J.'s constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against Defendant Spradlin and Defendant Williams.

265. As a direct and proximate result of the occurrence which made the basis of this lawsuit, J.J. was forced to suffer:

a. Significant physical injuries;
b. Physical pain and suffering in the past and future;
c. Physical Impairment in the past and future;
d. Emotional distress, torment, and mental anguish in the past and future;
e. Medical expenses.

266. Pursuant to 42 U.S.C. § 1983 and § 1988, and Texas Civil Practice & Remedies Code section 41.003(a), Plaintiff seeks to recover, and hereby requests the award of exemplary damages, reasonable attorney's fees, and costs of court.

**VII.**
**ATTORNEYS' FEES**

267. If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

**VIII.**
**JURY REQUEST**

268. Plaintiff respectfully requests a jury trial.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this court. Plaintiff further prays for all other relief, both legal and equitable, to which Plaintiff is justly entitled.

Respectfully submitted,

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Attorney-in-charge
Texas Bar No. 24105721
Federal ID No. 3244213

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Of counsel
Texas Bar No. 00797196
Federal ID No. 1751291

*/s/ Breanta Boss*
BREANTA BOSS,
Of counsel
Texas Bar No. 24115768
Federal ID No. 3738118

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@scottpalmerlaw.com
scott@scottpalmerlaw.com
breanta@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF